(No. 33148.—

MISSISSIPPI RIVER FUEL CORPORATION, Appellee, *vs.* ELMER J. HOFFMAN, State Treasurer, *et al.,* Appellants.

*Opinion filed September 23, 1954—Rehearing denied Jan. 18, 1955.*

SCHAEFER and HERSHEY, JJ., dissenting.

LATHAM CASTLE, Attorney General, of Springfield, (JOHN L. DAVIDSON, JR., WILLIAM C. WINES, RAYMOND S. SARNOW, A. ZOLA GROVES, M. BROOKS BYUS, ROBERT E. McGLYNN, and RICHARD L. COOPER, of counsel,) for appellants.

KRAMER, CAMPBELL, COSTELLO & WIECHERT, and NORMAN J. GUNDLACH, both of East St. Louis, DOUGHERTY & WHITE, of New York, N.Y., and HENDREN & ANDRAE, of Jefferson City, Mo., for appellee.

Mr. CHIEF JUSTICE BRISTOW delivered the opinion of the court:

This is an appeal from a decree of the circuit court of St. Clair County enjoining Elmer J. Hoffman, State Treasurer, and Richard J. Lyons, Director of the Department of Revenue, from paying into the State Treasury moneys collected from the appellee, Mississippi River Fuel Corporation, under the supposed authority of section 2 of the Gas Revenue Tax Act. Ill. Rev. Stat. 1953, chap. 120, par. 467.17.

That act imposes upon persons engaged in the business of distributing, supplying, furnishing or selling gas to persons for use or consumption and not for resale, a tax at the rate of 3 per cent of the gross receipts from such business, after June 30, 1945. It provides further: "However, such taxes are not imposed with respect to any business in interstate commerce, or otherwise to the extent to which such business may not, under the constitution and statutes of the United States, be made the subject of taxation by this State."

The amount here involved, $1,100,700.44, covering a period of something over a year, was paid by the appellee under written protest, after which appellee filed its com-

plaint, asking for a temporary and a permanent injunction, restraining the predecessors⁻ in office of the defendants above named from paying the money over into the State Treasury. On December 8, 1952, the trial court issued a restraining order as prayed, without notice.

Appellants' motion to vacate this order was denied December 24, 1952. Thereafter, after hearing, the trial court, on October 30, 1953, entered the decree here appealed from, by which decree it restrained appellants from paying into the State Treasury the funds so collected and from making any further attempt to assess or collect from the appellee any tax claimed to be due under the statute above referred to.

Appellee, Mississippi River Fuel Corporation, is a Delaware corporation organized in 1928 for the purpose, among other things, of transporting natural gas from gas fields near Monroe, Louisiana, to the St. Louis, Missouri, area. In 1929 it constructed a pipeline west of and approximately parallel to the Mississippi River, from a point near Monroe, Louisiana, to point in Missouri somewhat south of the city of St. Louis, from which latter point the line was extended easterly across the Mississippi River into Illinois and thence northerly to a point opposite the northern part of the city of St. Louis, from which latter point two lines were extended westerly across the Mississippi River into St. Louis for delivery of natural gas to Laclede Gas Company, which serves gas in that city. Appellee's pipeline, for the most part, is 22 inches in diameter, dropping down to 18 inches and 16 inches as it extends northerly in Illinois.

In 1947 a second line was built across the Mississippi River into Randolph County, Illinois. This line turns in a northerly direction, somewhat east of the city of East St. Louis, and connects with the original line, at a point south of the city of Alton, Illinois.

From these two lines gas is sold to 23 industrial customers, whose plants are located along the lines and who

buy the gas for their own use. In addition, appellee sells, and delivers from these lines, natural gas to two Illinois public utility companies, Illinois Power Company and Union Electric Power Company, which resell most of the gas to the general public in Madison and St. Clair Counties in Illinois, retaining some of it for their own use as boiler fuel. The sales by appellee to these public utility companies are involved in the present dispute only to the extent that they purchase some of the gas for use under their own boilers. Appellee asserts that these sales are made in interstate commerce and are not taxable by this State. Appellants, on the other hand, contend that the sales to the industrial customers are not sales in interstate commerce, but are intrastate in character, and as such, are subject to taxation under the statute referred to. In the alternative, they contend, somewhat less aggressively, that, even if the sales are in interstate commerce, the tax is not discriminatory and is not an undue burden upon that commerce, and hence is valid.

All of the gas is sold by the appellee to these customers under written contracts, which are in evidence. As to some of it, appellee is firmly obligated to make delivery; as to a very considerable part of the gas, appellee reserves the right to interrupt delivery under conditions provided in the contracts.

There is some conflict of statement between the parties as to the exact nature of the things done in Illinois by appellee. We find appellants asserting, apparently by way of emphasizing the local character of appellee's activities, that, in addition to selling and delivering the gas to the industrial customers in question, appellee in some way "prepares" and "transforms" the gas in Illinois for delivery to its Illinois customers. This appellee denies. There is no basis for appellants' assertion. We have examined the evidence in the record on this point, and we find the testimony to be uncontradicted to the effect that the gas is delivered

in the same form in which it is transported through appellee's pipelines from the fields, and that at the point of delivery, the gas is not reduced by appellee to such a pressure as to make it usable by the customer. The industrial customers receive the gas at 25 to 150 pounds pressure per square inch, which, as the record shows, is much in excess of the pressure at which it can be utilized. Such pressure reduction as is necessary to make the gas usable is done in every case by the customer.

Appellants devote a considerable part of their argument to a discussion of an attempt which is being made by appellee to create a gas storage field in Illinois in an exhausted gas field in Monroe County. It is enough to say that even if appellee had fully succeeded in this endeavor and if some of the gas sold to its industrial customers had for a time been held in storage in the places mentioned, it would not, in our opinion, detract in any way from the interstate character of the whole transaction. A freight train carrying an interstate shipment may pause for a long time at a railroad siding in the course of the shipment without changing the interstate character of the whole act. It is well known, at least to those acquainted with the natural gas pipeline industry, that in several parts of the country such gas storage fields exist, and it has never been supposed that the existence and use of this method of underground storage has in any way detracted from or minimized the interstate character of the business of such pipeline companies.

There are other irrelevancies in appellants' argument. It is unimportant, as we view it, that appellee furnishes to some of its customers apparatus for burning fuel other than natural gas. The interruptible gas service which appellee renders presupposes that other fuels will be used during periods of such interruption, and for the protection of its interstate gas business, appellee is entirely justified in

facilitating the use of such other fuels by the means mentioned.

The same considerations apply to appellants' argument that appellee's business is in some way reduced to a local intrastate one by reason of the fact that appellee sometimes finds it advisable to "pack" gas in its pipelines at higher than normal pressure. Such "packing" is treated by appellants as identical with "storage." What we have said above with respect to underground storage of gas as a proper and useful part of interstate commerce disposes of this question of "packing." We may point out, however, that the record shows that even when the lines are packed with gas at an unusually high pressure for some temporary reason, the gas continues to flow in the pipes.

We do not propose to discuss in detail all of the authorities cited by the parties, as we find one or two of them to be controlling. In the case of *Panhandle Eastern Pipeline Co.* v. *Public Service Commission of Indiana,* 332 U.S. 507, the court was considering the character of sales of gas by an interstate pipeline company (Panhandle) directly to industrial customers of the State of Indiana. Commenting upon the character of these sales, it said: "Nor do we question that these sales are interstate transactions. The contrary suggestion left open in the state supreme's court's treatment rests upon the view that gas transported interstate takes on the character of a commodity which has come to rest or broken bulk when it leaves the main transmission line and, under reduced pressure, enters branch lines or laterals irrevocably on its way to final distribution or consumption. Those merely mechanical considerations are no longer effective, if ever they were exclusively, to determine for regulatory purposes the interstate or intrastate character of the continuous movement and resulting sales we have here. Thus gas furnished to local utilities for resale is supplied unques-

tionably, both as to transportation and as to sale, in interstate commerce. Yet it is subjected to practically identical changes in pressure with the gas sold by appellant directly for industrial use. Neither practical common sense nor constitutional sense would tolerate holding that reduction in pressure makes the industrial sales to Anchor-Hocking wholly intrastate for purposes of local regulation while deliveries at similar pressures to utility companies remain exclusively interstate. Variations in main pressure are not the criterion of the states' regulatory powers under the commerce clause. *Cf. Interstate Gas Co.* v. *Power Com.* 331 U.S. 682, 689. The sales here were clearly in interstate commerce."

The present case presents an exactly parallel situation, as we view it. The sales by appellee to its industrial customers for their own use are shown by the record to be made in exactly the same way and under exactly the same conditions as the sales made by appellee to the two public utility companies who purchase the gas for resale. The physical acts done in Illinois are identical in both cases, as we read the testimony, yet appellants in their argument frankly concede that the sales to the two public utilities are sales in interstate commerce while they deny that result as to the sales to the industries.

Appellants have allowed themselves to become confused between interstate commerce in its constitutional aspect and that part of interstate commerce which Congress chose to take under Federal regulation by the Federal Natural Gas Act of 1938. In that act Congress gave to the Federal Power Commission power to regulate rates and all other aspects of sales of gas by interstate pipelines to purchasers for resale, the purchasers being, in general, local public utility companies. But in that act, Congress refrained from giving to the Federal Power Commission power to regulate the rates for gas sold by interstate pipelines to customers who took gas for their own use. (See *Panhandle case.*)

But this statutory distinction which Congress elected to make certainly did not mean, as appellants seem to deduce, that the sales for resale were sales in interstate commerce while the sales to industries for their own use were not. Jurisdiction over both types of sales could without question have been given by Congress to the Federal Power Commission had it chosen. It was because of this statutory choice by Congress that the *Panhandle case* quoted from above was decided as it was. The quoted language from the opinion in that case shows as plainly as possible that the United States Supreme Court fully recognizes the interstate character of industrial gas sales such as are here involved. The very recent case of *Phillips Petroleum Co.* v. *State of Wisconsin,* 347 U.S. 672, decided June 7, 1954, accords in principle with the *Panhandle* decision. There it was held that the Phillips Petroleum Company in selling gas to an interstate pipeline, was doing an act which amounted to participation in interstate transportation of gas and hence was subject to the Federal Power Commission. The late case of *Michigan-Wisconsin Pipeline Co.* v. *Calvert,* 347 U.S. 157, is in principle the same. It also was a case where a local producer of gas introduced it into an interstate pipeline. The court held a Texas State tax on the gathering of the gas to be invalid as a burden on the interstate transaction of selling and delivering the gas to the pipeline. The court said, at page 401, "The recurring problem is to resolve a conflict between the Constitution's mandate that trade between the states be permitted to flow freely without unnecessary obstruction from any source, and the state's rightful desire to require that interstate business bear its proper share of the costs of local government in return for benefits received. Some have thought that the wisest course would be for this Court to uphold all state taxes not patently discriminatory, and wait for Congress to adjust conflicts when and as it wished. But this view has not prevailed, and the Court has there-

fore been forced to decide in many varied factual situations whether the application of a given state tax to a given aspect of interstate activity violates the Commerce Clause. It is now well settled that a tax imposed on a local activity related to interstate commerce is valid if, and only if, the local activity is not such an integral part of the interstate process, the flow of commerce, that it cannot realistically be separated from it. (*Memphis Natural Gas Co.* v. *Stone,* 1948, 335 U.S. 80, 87, 68 S. Ct. 1475, 1478, 92 L. ed. 1932; *Western Live Stock* v. *Bureau of Revenue, supra,* 303 U.S. at page 258, 58 S. Ct. at page 550.) And if a genuine separation of the taxed local activity from the interstate process is impossible, it is more likely that other states through which the commerce passes or into which it flows can with equal right impose a similar levy on the goods, with the net effect of prejudicing or unduly burdening commerce." (*Puget Sound Co.* v. *Tax Commission,* 302 U.S. 90, 1937.) These holdings render pertinent the decision in *Puget Sound Co.* v. *Tax Commission,* 302 U.S. 90, in which the court held that the act of loading or unloading of goods at the beginning or end of an admittedly interstate or foreign act of transportation of a cargo is a part of the transportation itself and cannot be taxed by the State in which the act is done. The court said: "The business of appellant, insofar as it consists of the loading and discharge of cargoes by longshoremen subject to its own direction and control, is interstate or foreign commerce. Transportation of a cargo by water is impossible or futile unless the thing to be transported is put aboard the ship and taken off at destination. [p. 92.] The business of loading and unloading being interstate or foreign commerce, the State of Washington is without liberty to tax the privilege of doing it by exacting in return therefor a percentage of the gross receipts. [p. 94.]"

That the *Puget Sound Co. case* represents the settled law on this subject may be inferred from the language in

*Michigan-Wisconsin Pipeline Co.* v. *Calvert,* where the court referred to the act of taking gas into an interstate gas pipeline as an operation of "loading." (Sup. Ct. Off. No. 198 *et seq.* Oct. Term, 1953.)

We will deal only briefly with that part of appellants' argument in which they contend that, even if these industrial sales are sales in interstate commerce, the tax is valid because it does not constitute an undue burden upon that commerce or discriminate against it. We are aware that the United States Supreme Court has at times used language which indicates that where interstate commerce is only collaterally involved a State tax may be levied if it does not constitute an "unreasonable interference by the state" or does not "unduly burden" the interstate commerce. We do not find that it has ever given a definitive meaning to this general language. We have no means of knowing when a tax burden is "undue" or "unreasonable." It seems to us that the language referred to cannot possibly have any application to a case like the present one where the tax is directly imposed upon the very act of sale which constitutes an integral and essential part of the interstate commerce in question. If the State of Illinois can take 3 per cent of the proceeds of such sale by way of tax, it could presumably take more, up to some unknown and unascertainable point where the burden would clearly become "undue" or "unreasonable." The present case involves the sum of $1,000,000 which, in our view, represents a substantial burden upon the payer regardless of its size or resources.

Appellee, in its argument, analyzes the case of *Sprout* v. *South Bend,* 277 U.S. 163, and refers to it as authority for the propositions that "the state must not impose a tax solely on account of the interstate business done," and that "an occupation tax cannot be levied by a state upon a business devoted exclusively to interstate commerce." We believe that, by indirection at least, the case

supports both of these propositions, and they completely answer appellants' argument that the tax here can be sustained as nondiscriminatory. All of the business done by appellee in Illinois is shown to be interstate in character, and the disputed tax is levied directly upon and on account of a part of that interstate business.

Appellants place much reliance on the case of *Norton Co.* v. *Department of Revenue,* 340 U.S. 534, 405 Ill. 314. We view the holding in this case differently. The Norton Company, a Massachusetts corporation, manufactured and sold abrasive machines and supplies. Under consent from the State of Illinois to do business therein, it operated a branch office and warehouse in Chicago, Illinois, from which it made local sales at retail. All sales to Illinois customers were not over the counter sales, but the State collected a tax on the entire gross income. In the Chicago warehouse the company carried 3000 most frequently purchased items. From them it served its cash customers. The Chicago office performed other functions, helpful to other classes of customers, namely, for those without credit; those who ordered items not carried in the local stock; those who desired special equipment. It received their order and forwarded it to the home office. For many Illinois customers it acted as an intermediary to reduce freight charges. Upon receipt of the order in Worcester, the goods were packaged and marked and allowed to accumulate until a carload lot could be consigned to the Chicago office, where the separate orders were reconsigned. The Chicago agency thus intervened between the seller and all vendees, and performed a valuable service in their selling operation. Upon such procedure, both this court and the the United States Supreme Court held that the questioned tax was within constitutional bounds. However, there were sales wherein orders were sent directly to Worcester by the customer and the goods were shipped directly to the customer from Worcester. On these items of interstate

commerce this court was reversed and the United States Supreme Court held that they were not taxable. Appellee's operation in the instant case does not have the local and retail characteristics present in the merchandising scheme of the Norton Company. Other cases relied upon by appellants are likewise distinguishable.

A State, of course, may levy *ad valorem* taxes upon the property of an interstate gas pipeline or other interstate carrier, (*Braniff Airways, Inc.* v. *Nebraska State Board of Equalization,* Sup. Ct. Off. 476, the cases cited,) and appellee's property is shown to be so taxed like other property in Illinois.

The sales by appellee to its 23 industrial customers as well as the sales of gas to the two public utility companies for their own use, even though not subject to rate control by the Federal Power Commission, are very clearly sales in interstate commerce and hence cannot be taxed by the State of Illinois. The money heretofore collected should be returned to appellee and no further comparable collection should be attempted. The decree of the circuit court of St. Clair County was right and is affirmed.

*Decree affirmed.*

Mr. JUSTICE SCHAEFER, dissenting:

Section 2 of the act, which is quoted in the court's opinion, makes it clear that the issue here is whether this tax is forbidden by the commerce clause of the Federal constitution or by Federal statute. That issue is not determined by deciding simply that Mississippi's activities constitute a "business in interstate commerce." The court's treatment of the case leaves out of account the fact that the validity of similar taxes has often been decided in terms of their economic effect and their tendency to impose undue burdens upon interstate transactions. See Powell, More Ado About Gross Receipts Taxes, 60 Harv. L. Rev. 501, 710; Barrett, State Taxation of Interstate Commerce, 4 Vand. L. Rev. 496.

There are, I think, significant characteristics of this tax and of the transactions before us which have been overlooked. This tax cannot discriminate against interstate commerce, for it applies to all sales of gas for use or consumption. Nor does this tax give rise to any possibility of multiple taxation, for the taxable event is the sale "for use or consumption and not for resale." The transaction which gives rise to tax liability is thus the transaction which terminates all commerce, interstate and intrastate.

Under its contracts with its industrial customers Mississippi has undertaken to maintain equipment in Illinois. It owns and services equipment inside the plants of its industrial customers for the purpose of carrying out these contracts. The purchaser pays only for what is delivered at its local plant in Illinois; all of the risks of loss in transit are borne by Mississippi. Mississippi holds a franchise from the State of Illinois to engage in business in Illinois. The tax here involved is not measured by gross receipts upon all of Mississippi's sales of gas in Illinois, but only by receipts from those sales which are for use or consumption and which thus eliminate the gas as a future subject of commerce.

In its sales to industrial consumers which are here involved, Mississippi competes directly with public utilities which are unquestionably subject to the tax when they sell gas to their customers. Instead of discriminating against interstate commerce, the present tax does no more than to impose upon Mississippi's transactions the identical burden which is borne by competing sellers of the same commodity within the State. If Mississippi's sales to industrial customers cannot be reached by the tax, I see nothing which would prevent other utilities in Illinois from purchasing gas outside the State, bringing it within the State, and selling it for use or consumption here, free of the tax.

The cases on which the court relies are not, in my opinion, controlling. The tax invalidated in *Michigan-*

*Wisconsin Pipe Line Co.* v. *Calvert,* 347 U.S. 157, was one imposed by the State of origin upon the "taking" of gas into a pipeline for immediate interstate transmission. Apart from other differences, taxes by the State of origin have not ·been treated as equivalent to those imposed by the State of destination since their effect is different. (See, *e.g., McGoldrick* v. *Berwind-White Coal Mining Co.* 309 U.S. 388; *Gwin, White & Prince* v. *Henneford,* 305 U.S. 434; *Freeman* v. *Hewit,* 329 U.S. 249.) *Panhandle Eastern Pipe Line Co.* v. *Public Service Com.* 332 U.S. 507, dealt with regulation, not taxation, and the actual holding in that .case sustained the power of the State to regulate the direct sales in interstate commerce which were there involved. Under the commerce clause the limits upon State power to regulate are not necessarily identical with those upon State power to tax; but so far as the regulation cases are at all relevant, they argue in favor of State power rather than against it.

The tax here imposed is in material respects identical with that which was sustained in *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465. (See also *Southern Natural Gas Co.* v. *Alabama,* 301 U.S. 148; *Memphis Natural Gas Co.* v. *Beeler,* 315 U.S. 649.) Prior to the *East Ohio* decision, the Supreme Court had already taken the position with regard to State regulatory powers that unlike sales of gas to utilities for resale, direct sales for consumption were within the area of State control. (*Public Utilities Com.* v. *Landon,* 249 U.S. 236; *Pennsylvania Gas Co.* v. *Public Service Com.* 252 U.S. 23; *cf. Missouri* v. *Kansas Gas Co.* 265 U.S. 298.) So far as the *East Ohio* decision may be thought to rest on such "mechanical" considerations as reduction in pressure, it is now of doubtful authority. (See *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.* 314 U.S. 498, 504-506; *Panhandle Eastern Pipe Line Co.* v. *Public Service Com.* 332 U.S. 507, 512-513; but *cf. Federal Power Com.* v. *East Ohio*

*Gas Co.* 338 U.S. 464, 469-473.) But subsequent cases have not rejected the "wholesale-retail" criterion for determining the permissible reach of State power.

The theory employed in the *East Ohio* opinion to sustain the tax was that interstate commerce ended when distribution to the consumer began, the same theory which had been employed to sustain State regulation in the *Landon case.* As the majority opinion here notes, subsequent pronouncements of the Supreme Court have reverted to the different standard employed in *Pennsylvania Gas Co.* v. *Public Service Com.* 252 U.S. 23, 30-31, and the present view seems to be that these direct sales are interstate commerce, and that the State's power to control them rests on the fact that these sales are "essentially local" in character. (*Panhandle Eastern Pipe Line Co.* v. *Public Service Com.* 332 U.S. 507, 523-524; *Panhandle Eastern Pipe Line Co.* v. *Michigan Public Service Com.* 341 U.S. 329; *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.* 314 U.S. 498, 504-506.) More significant than this change in theory, perhaps, is the fact that whether sales of this kind have been regarded as interstate or intrastate, State power to regulate them has been sustained. I do not think, therefore, that subsequent decisions justify disregarding the *East Ohio* holding.

Last year this court held that Mississippi's direct sales were not subject to regulation by the State. (*Mississippi River Fuel Corp.* v. *Illinois Commerce Com.* 1 Ill. 2d 509.) The result of that decision was to give the appellee a favored economic position as against competing local utilities. Today the court creates a similar result by holding these same sales immune to taxation. I do not believe that the commerce clause requires that interstate commerce be given more than equal treatment. The decree below should be reversed.

Mr. JUSTICE HERSHEY concurs in the foregoing dissenting opinion.